The next case up for argument is Sheena Zehnder v. Mayo Clinic-Arizona. Sheena Zehnder v. Mayo Clinic-Arizona Proceed when you're ready, Counsel. Good morning, Your Honours, and may it please the Court. My name is Lindsay Leavitt. I represent the appellant, Dr. Sheena Zehnder, and I'd like to reserve two and a half minutes for rebuttal, please. All right. This is not going to be a popular... That's going to be very precise to track, but try to keep track of your own time as well. Will do. This is not going to be the most popular way to start an oral argument, but I'm going to start with some basic math. There are 168 hours in a week, 24 times 7, per Mayo Clinic's regularly scheduled hours. There are 50 regularly scheduled working hours in a work week, 7 a.m. to 5 p.m., Monday through Friday. I think we know your argument on that. The challenge of that is it just seems fairly obvious that for many jobs, maybe a lot, maybe the majority of jobs, there are certain tasks that don't take very much time but are really, really important. A police officer's ability to make an arrest, say. Hopefully they're not spending the majority of their time actually making arrests. A firefighter's ability to carry somebody, arguably a judge's ability to sit on... I have to tell my friends that aren't lawyers, I don't really actually sit on a bench that often. I spend most of my time grinding away in a chamber. I didn't really understand that argument. What I'm getting to, though, is if we subtract 50 hours, the regular working hours, from the total 168 in a week, we're left with 118 hours that Mayo Clinic is open and operational that need to be covered by the radiology department. Those 118 hours are staffed by a pool of trainees, second-year, third-year, and fourth-year residents and fellows. Those 118 hours are staffed by those trainees in what's called call shifts. Now, the residents will work a typical rotation, 7 to 5, doing breast imaging or nuclear radiology or whatever it is in the rotation, but then they'll be assigned a call shift. All 118 hours that are outside of the regular working hours are staffed by residents and trainees via these call shifts. Now, there's three types of call shifts. There's short call, there's weekend call, and there's night float. My client, Dr. Sheena Zender, has a physical disability. Her body cannot physiologically adapt to a different sleep schedule, morning to night, day to night, back to day. The validity of her disability is not on the appeal. That's not a subject for the appeal here. But she, recognizing that there's 118 hours of call shifts, she proposed that she work the same number of call hours as every other resident. In fact, she proposed she'd work more call hours than every other resident, but that she'd just not be assigned to the overnight hours. Mayo said no. They said the overnight hours of these 118 hours of call shifts, they said the overnight hours are so essential, are so crucial, are so magical that something happens during those overnight hours that can't be replicated. Well, they said a couple of things, I think. One is they said they suck, right? Like, the night hours suck. And so everybody, you know, my son's in medical school, right? Everybody dreads residency. Why? Because part of what residencies do is they use, the market uses these people that don't like junior associates, you may be familiar with that, to do the part of the job that people don't like. So, I mean, it seems to me that hiring residents, you're kind of hiring them for the shift that stings. And that helps Mayo, right? And that's legitimate. There's nothing, I don't think, wrong with that if that's what they're doing. They could have, instead of calling them residents, they could have called them the night shift radiology MDs, right? And then they also have this other argument that, you know, you're saying the magical argument that it actually is good for their training to have the independence and to have to. And those are two different things. But they both seem, what's illegitimate about, what's illegitimate about hiring for night shift radiology doctors and then her saying, her taking that job and then saying, oh, I can't work the night shift. Well, I think, let me back up here. Mayo has hired full-time night shift radiologists. We call them the night hawks. They're often referred to as attending radiologists. And they've hired, no, I understand that they have other people that do night shift, but they also hire these people to do night shifts. The fact that you may have two different groups of people that do night shifts, is it, is Mayo allowed to say we're hiring for night shift? I mean, they must because you don't seem to have a problem with the night hawks. So why can't they say the residents are our night shift? Well, they can say that, but they didn't. What they say is. No, they did. When she took the job, she was well aware of the fact that like residents work the night shift in their second, third and fourth year. She was aware of the fact that there's 118 hours of call shifts that residents are required to staff. Now, whether she works a call shift at 7 p.m. on a Tuesday or 3 a.m. on a Thursday or 6 p.m. on a Saturday or Sunday, the actual work that she's doing during those call shifts isn't so materially different that working overnight is an essential function. And she can't become a radiologist unless she works. Would it make a difference if they had called it the night shift residency? The residency with night shifts. Would that make a difference for you, your argument? If they called it a night shift residency where she was expected to work four years of night shifts, certainly that is the function that she would be hired to do. Okay. So what if they said we're expecting you to work four years and some of it will be night shifts? In other words, does it only get outside the – does the claim depend on that it's 100% night? Like if they hire her for 50 and 50, is that an essential part or not? No. And I don't want to get into a bright line of if it's 10% or 12% or 50%. I don't think that's the analysis because what Mayo said is there is something educationally beneficial to the overnight shifts. That's one of their arguments. I understand that. But the other one is that there must be a resident on duty during the night. No, they're not necessarily a radiologist on duty during the night. Right, and there are. There are two night hawks that are full-time radiologists. Well, what I'm asking is putting aside – why can't they just say there needs to be a radiologist and that is part of your job as a resident? Right, but a residency is not a typical employer-employee relationship. Residents aren't hired to work shifts for wages. The purpose of the residency, as it says in Mayo's own handbook and in the ACGME, is for residents to become highly qualified radiologists. Night float is not a rotation. May I have you address one of the arguments that they raised that you touched upon with Judge Van Dyke, is that there is something about the night shift that brings the resident radiologist closest to autonomous, independent decision-making. Can you spend just a minute or 30 seconds kind of highlighting the factual disputes around that? Is there something qualitatively different about the night shift that you can't get on other shifts? And the answer is no, and that has especially changed since 2023 because Mayo's analysis of the night shift and how important it is is a pre-2023 analysis, but that changed in 2023. And let me explain why. That is because before 2023, the night resident would be the only resident on duty. And if they needed help reviewing an image, they would have to call an attending radiologist who was asleep in the middle of the night and wake them up and say, I don't know if this is a brain bleed or whether it's a tumor, I don't know what this is. But what would happen is these residents on the night shift before 2023, they had the opportunity to prepare what's called preliminary reports. And these preliminary reports would be sent to the attending physician in the ER or whatever department it is. In the middle of the night, the ER is typically the only department who are ordering images. No one's getting a breast image at 3 a.m. in the morning. And so that preliminary report drafted by the resident on night float would be sent to the doctor in the ER, and the ER doctor would say, hey, this kid came in in a car accident. Wow, he's got a brain bleed. We need to do surgery right away based on this preliminary report that the night resident drafted. And so that's like high stakes for a resident on a night shift to draft that report that is not being what's called overread, that's not being reviewed and approved before it goes to the ER doctor who's diagnosing a brain bleed. That changed in 23. Now we have Nighthawks who are assigned specifically to the overnight shift who work alongside the night resident, reducing the autonomy of the resident. And here's how. Instead of the resident drafting a report and no attending radiologist reviewing it for eight hours until the next morning when they come in, which was a pre-2023 reality, now the resident drafts a report and the Nighthawk reviews it 30 to 60 minutes later and signs off on it. And here's why that 30 to 60 number is so important. It's because the testimony of Dr. Andrew Sill, who's the only person in this case who actually worked the radiology residency program at Mayo and completed it, he said 30 to 60 minutes is the typical delta of time for an attending radiologist, a faculty radiologist, to provide an overread on a preliminary report. 30 to 60 minutes is the typical time during a day shift. It's a typical time during work hours. It's a typical time during night hours now. It's the typical time on weekends. It's the typical time in all the shifts. So if Mayo wants to argue that the night shift is so much more autonomous and there's so much more opportunity to grow and learn and develop, that's just not the reality of the facts. You say so much. Is your position that there is not more? So it seems like your argument is there's not complete autonomy or the level of autonomy there was pre-23. Is your argument that it's no more autonomy than during the day? It's exactly the same? Or is there a difference? No, I appreciate you. Let me refer to my notes on that. We are arguing, and it's important for us to clarify, that night float gives a good opportunity for residents to demonstrate their ability to take independent call. That's an ACGME requirement, take independent call. Night float is good at that. But it's not any better than the 118, all 118 hours of call shifts allow a resident the same opportunity to demonstrate their ability to take independent call. There is no meaningful difference except sometimes the moon is out and high in the sky, and sometimes it's a little lower. Sometimes the sun's coming up. Sometimes the sun's going down. That's the only meaningful difference between these 118 hours of call shifts. So you're saying, for those of us that aren't doctors, you're saying that there's no difference between the two. Mayo is saying there's a difference. It puts us in a tough spot, and you essentially want a jury to decide whether or not Mayo's view of their curriculum of the night shift adding benefit, you want that to be second guessed by either us or a jury, I guess? What I want is that this is whether an overnight portion of these call shifts is an essential function at Mayo. That's not a question of law that can be resolved on summary judgment. There are enough facts here to show that there's no meaningful difference in the autonomy, in the educational training, in the number of procedures done, in the number of images read. There's no meaningful difference between any of the 118 call hours that a resident gets the opportunity to work. My client proposed that she would work just as many call hours as any other resident, but she would just do it at a different time. Mayo says, no, there's something so essential about overnight. What is their evidence that there's something essential? They have none. It's the decision of one person, Dr. Fox, who's the program director, who says it is vital. Can I ask you a question? On the 23 stuff you were talking about, I'm not tracking where that fits with. There's some dispute from Mayo as to how much of this factual evidence is properly before us. The 23 stuff, was that before the district court judge, before she issued the first summary judgment? Yes, extensively. And Mayo's own witnesses testified that the autonomy of the night float reduced drastically after the Nighthawks were retained. And I'll save the rest of my time for a moment. Let me see if Judge Gould has any questions at this point. Judge Gould? No questions. All right. Thank you, counsel. Thank you. Good morning, your honors. John Lomax for Mayo Clinic, Arizona. May it please the court. I want to pick up right where you all left off. What changed with the Nighthawks in 2023? There's no evidence in the record of what night float, that overnight shift from 9 p.m. to 7 a.m., is like after the Nighthawks were hired in August of 2023. Counsel points to Dr. Sill's testimony on this point. But it's important to note for the court that Dr. Sill performed the night float before the Nighthawks were hired in 2023. That's at ER 73, according to Dr. Sill's own testimony. More importantly, on the amount of time that it takes to overread or take this preliminary examination done by the resident and to have an attending physician review it, make sure it's accurate, Dr. Zender is suggesting that it's 30 to 60 minutes on the night shift. The citation to the record for that point also comes from Dr. Sill's testimony at ER 73-74. There, Dr. Sill says, typically, I would assume similar time to finalize the preliminary examinations in 60 minutes. The assumption there is speculative. It's not admissible testimony for this court to consider. And the reality is the testimony involved from Dr. Fox, the program director, and Dr. Hara remains unchallenged. There's an educational benefit to the night shifts. It's been proven out over time. And to suggest that Dr. Fox is not qualified to speak to that issue, he is. He's the program director, and under the ACGME requirements, he's the sole person who verifies whether the individual and the resident completing the program is qualified to practice autonomously. Let me make sure that I understand this point because it's an important one. We're looking for a triable question here as to whether overnight shift is qualitatively different or educationally distinct. And what you're saying is that since 2023, the hiring of the Nighthawks makes no difference in reducing the autonomy of the resident radiologists? Or are you saying that it does reduce the autonomy to some extent, just not qualitatively different? In other words, there's no triable question on that point. I think it's the latter, Your Honor. The acknowledged testimony from Dr. Hara and Dr. Sill was it was a difference. It made a difference that you might have another attending physician who is online and available to read. From Mayo's perspective, it does not make a major difference. And both Dr. Fox, Dr. Sill, and Dr. Hara, the department chair, were all in agreement on that point. And the reason it doesn't make a major difference is these attending radiologists or emergency radiologists that, as Mayo refers to the Nighthawks, are all remote. They all work out of state. That fact is undisputed in the record. They're not in the reading room down the hall from the emergency room department. They're not interacting with the physicians and other residents who may be performing surgery or delivering care. They're available to help man. And the resident on site is there to handle contrast coverage to ensure that there is a radiology resident on site to deliver medical care. Well, they're not on site, but what counsel is saying is that it's reviewed within 30 to 60 minutes, which is not significantly different from the other shifts as well. Well, and that's based on the speculative testimony of Dr. Sill, who had not worked on a night float where the Nighthawks had been after they had been hired. The Nighthawks were hired, according to Dr. Hara's testimony, because Mayo did a major expansion of its emergency room and added 27 new rooms. And that was the purpose behind hiring the emergency radiologists to work on these overnight hours, to provide reads for the individuals. I'd also like to point out to the court two other things. The issue that we're talking about, when you think about what the substantive law is, and the substantive law is what determines what's a genuine issue of material fact, this whole discussion really centers around the consequence of not requiring the incumbent to perform the job. That's one factor under the EEOC regulation. Much of what Dr. Zender positions this case around is the consequence to her, whether she believes she can get the educational benefits from the program on these short call or weekend call shifts. But what the regulation is really addressing is, what's the consequence to the employer? And here, it's Mayo's mission to deliver high-quality care. That's the patient care aspect. We have to have someone on site there to deliver the care. But Mayo's mission is also to educate future leaders in the delivery of medicine, not only through the medical school, but through graduate medical education, which is what the radiology program represents. And it compromises, in Mayo's judgment, the quality of the educational program to produce independent functioning radiologists if it's not allowed to assign these individuals to these important overnight on-call shifts. So when you look at the substantive law, it's Mayo's position that the consequence of not requiring the incumbent to perform the job favors them. And if we focus on the substantive law, that's the issue, the one factor that most of the testimony and most of the points made in the opening and reply brief seem to relate around. When you go to the other things, like the employer's judgment, the employer's judgment is something the statute says the courts must consider. And here, there's no testimony challenging Dr. Hara and Dr. Fox's testimony on the importance of the overnight shifts. And as you begin to go through the other factors, the consequence, excuse me, the job description, which is also mentioned in the statute, specifically says the resident must meet Mayo's work hour requirements. At the time the resident agrees to join the program, they sign an offer letter that references the summary terms and descriptions. And in those summary terms and descriptions, it says part of your job duties is to comply with the job description. The job description work hour requirements are specifically referenced as essential job functions that must be complied. And here, there's no dispute. I believe it's even in the record, the calendar entries from Dr. Zender at the time she interviewed for the residency in January 2021 indicated the call times. NF, night float, five weeks in the third year of the program. And NF, eight weeks, eight weeks of night float in the fourth year of the program. She understood exactly what was required and expected. And the duality here that Dr. Zender talks about is important also. In the reply brief, there's a statement that she came to Mayo to get certified, but that completely ignores the duality on the employee relationship side. Part of the duty that Mayo's expecting the residents to perform is to be on site and be available on these overnight shifts. I want to comment as well on the amount of time. There's no real dispute. We came up with different calculations, but there's no real dispute about the amount of time that's required to be on the night float. The issue, as this court has previously ruled, is whether if it's a 6% or 10%, as we suggest, in the third year and 16% the fourth year, the issue ultimately is whether it is important and essential job function, even if it's a smaller percentage of the time than one might like. And the firefighter example cited in our briefs, although I think we neglected to make the citation, it actually appears in the EEOC regulations in the appendix section. I think I had forgotten that until we were reviewing, but it's a very real example that demonstrates the importance of it. I do want to comment, too, on the Samper case from this court. The Samper case involved a NICU neonatal nurse who wanted to be excused from attendances. This court looked to the employer's judgment, common sense, and highlighted that the employee was part of a team, that the job required face-to-face interactions. It required 24-7 work in a hospital environment, and it required work to be performed on site. Those are the exact same factors that are present here. While it's not attendance that's at issue, it's the night shifts here, it's much like attendance. We need you to be there at certain times. You're going to share that responsibility with others, namely the other residents in the program. This court in Samper ultimately concluded that what the plaintiff was suggesting was to have others perform the job is really causing a merger of the reasonable common accommodations analysis and the essential job functions. And that's why the court in Samper, like this court in Darke v. Curry County, said, you can't exempt someone from the essential job duties. That's improper. And Dr. Zender presses that argument on appeal. In doing so, she references the Nighthawks. Well, they're not there to work on site. She references the Fellows. That's a new argument that was injected into this case and, therefore, is after judgment in her October 2024 declaration and is, therefore, outside the scope. And then she also references the attending physicians. That was not an argument pressed below. She points to no evidence for that. And last, she points to the supplemental, the contractors. And that's the argument she pressed below, and that's the argument that the district court said, this is why Samper is important, because you're asking to be exempted from this job duty. Finally, I want to comment on the Periskevopoulos case, which is a decision out of the District of Maine. Counsel had spent, or excuse me, Dr. Zender, in the briefs, had cited this point. But the point about this case is it doesn't stand for the proposition that this court should defer to what an accrediting agency is. In fact, the court in Periskevopoulos says the factor of whether a resident is meeting the ACGME requirements is notably missing here. The accrediting agencies set the framework of the conceptual guidelines. They're the floor. They're not the fact that they may or may not, depending on your interpretation, reference a specific shift working through the graveyard as the district court referred to it, is not ultimately determinative because it doesn't relate to the substantive law. The substantive law is dictated by the cases, the statute, and the regulations at issue. And we firmly believe the district court got it right and that the district court applied those in a way to determine there was no genuine issue of material fact and the summary judgment was appropriate. So, therefore, we'd ask this court to affirm the ruling in favor of Mayo Clinic Arizona on its motion for summary judgment on all counts. I'd be happy to take any questions from the court. Judge Gould? I have no questions. Thank you. Thank you, Your Honors. Is this my time, 150, or is this left over for me?  Okay, thank you. SAMPER doesn't apply. SAMPER holds that a regular and predictable attendance can, by itself, be an essential function of the job. We agree. Medical providers should show up when they're scheduled to show up. When she interviewed and accepted this residency, was there already an awareness and expectation that night shift would be a part of the job duties? Right. But she gave Mayo two years. She's not saying, I don't know if I'm going to show up to it. She's saying, I'm giving you two years to accommodate this disability. There's 118 hours of call shifts in a week. Can we structure the pool so that I'm not working the overnight hours but I'll work just as many call hours? SAMPER's request… She did that before her residency started but not during the interviewing process, right? Correct. Once she obtained the position, she sent the request for accommodation, correct. SAMPER requested… SAMPER, on the other hand, requests for accommodations was unplanned and in unnumbered and unplanned absences. That is not what my client did at all. Periscopalus is the most direct case on point. The court found that there was a question of fact as to whether overnight could be an essential function because the ACGME didn't require it. Overnight was not required in the real world to be a family medicine doctor. And that's the same evidence that's in the case here with radiologists. That's why my client, like her mother, intended to become a radiologist. And Periscopalus found there's no hardship to the hospital. That's the evidence in the case here. It's no hardship to Mayo to do it. The reply brief, pages 11 through 14, rebuts every single point that Mayo makes as to why they believe that… Does Dr. Sill have post-2023 experience, direct experience? Dr. Sill was a fellow after the Nighthawks were hired. So he was a fellow in the radiology program. Did he work night float shifts? I don't recall from his specific testimony, but he was still involved in the program when he was deposed. He was just a fellow. He graduated as a resident and stayed on for next year in a fellowship. And he was deposed during that time. So what is the – I assume that the time has passed so that it's not like she can finish her residency there. Has she moved somewhere else? What is the current status of things? Because it's a three-year residency. Is that right? It's a four-year residency. Four-year, okay. Yeah, that's right. You're asking me facts that are outside the record. I'm happy to share them. I'm trying to figure out what would be the relief that she would get if the case was remanded and the jury found that these were not essential and all that. Yeah, if the jury found these were not essential, then she would be entitled to damages for being removed from the program when she shouldn't have been. So she was removed from the program, okay. She's not, yeah. The court can take judicial notice on Mayo's website. It lists all of the residents, and she is no longer on there, and she's been removed from the program. And so what will happen if these are found not essential, she's entitled to relief, and whether that's to finish out her residency and become a radiologist or monetary damages or both, that's certainly what could happen. Okay. Judge Gould? I guess I'd like to hear counsel's view on how much discretion the hospital has to set its own requirements. Yeah, that's a great question. I've heard Mayo refer to the ACGME as a floor that they've chosen to have higher standards in, but they also refer to it as a framework, and that's how we've referred to it as well. The ACGME specifically says, and in 2022 its requirements were amended, and the ACGME encourages residency programs and gives them lots of discretion and flexibility to create a program that allows residents to comply with these requirements. Some of the requirements in Mayo's handbook are very objective. A resident, in order to pass the residency, must review a certain number of mammographies, breast images, must do a certain number of procedures. Those are very objective. We have no problems with those. But others are obviously more subjective. Demonstrate an ability to take independent call. The one part, though, Judge Gould, that I want to go to your question is the ACGME in 2022 specifically said that they are giving programs like Mayo more discretion, more latitude, and encourage them to work with residents to create a program that not only satisfies the requirements, but this is something that Mayo ignores. The ACGME specifically instructs Mayo to create a program that will encourage resident well-being. And so is it a floor, is it a ceiling? It's none of those. It's a framework that Mayo is permitted to operate within, and the boundaries of that framework are resident well-being, meet the requirements, and what we've proposed is a proposal and an accommodation that can do all of those things, and Mayo just refuses to do it, assuming that we're living in a pre-2022 and pre-2023 world. Thank you very much, counsel, to both sides for your very helpful arguments this morning. The matter is submitted.
judges: GOULD, NGUYEN, VANDYKE